MAKRESS LINGERIE, INC.,
Plaintiff,

v.

INTERNATIONAL LADIES' GARMENT WORKERS' UNION, AFL–CIO ("ILGWU"), and Local 601, ILGWU ("Local 601"), Defendants.

No. 75 Civ. 1850.

United States District Court,
S. D. New York.

May 30, 1975.

Guggenheimer & Untermyer, New York City, for plaintiff.

Max Zimny, New York City, for defendants.

## OPINION

ROBERT L. CARTER, District Judge.

Plaintiff, Makress Lingerie, Inc., by Order to Show Cause, has applied for an order permanently staying arbitration of the validity of a Settlement Agreement between it and defendants. The Order to Show Cause, with a temporary stay of arbitration, was signed on April 16, 1975, the day before arbitration was to commence. Oral argument was held on April 22, and the temporary stay was continued pending a final determination. For reasons set forth herein, the temporary stay is vacated and plaintiff is ordered to proceed to arbitration.

*Background Facts*

A collective bargaining agreement ("Association Agreement"), covering the period May 1, 1972 through May 31, 1975, is in effect between the Apparel Manufacturers Association of Puerto Rico, Inc. ("Association") and defendants International Ladies' Garment Workers' Union, AFL–CIO ("ILGWU") and Local 601, ILGWU (herein collectively "the Union"). Plaintiff, a Puerto Rican corporation with principal offices in New York City and Arecibo, Puerto Rico, is engaged in the business of manufacturing and selling lingerie and allied products. Its factory in Arecibo employs workers represented by Local 601.

In 1973, the Union filed a claim in arbitration alleging that plaintiff was producing lingerie in the Dominican Republic in violation of Article XXII of the Association Agreement, which prohibits work in outside shops when workers in an inside shop are not fully employed or where the outside shop employees are non-Union. Herman Kress, a senior member of the family which owns plaintiff and several related corporations, represented to the Union that the Dominican Republic operation was necessary for the preservation of jobs in Puerto Rico. Purportedly relying on this representation, the Union agreed to settle its claim against plaintiff. Affidavit of Lester Kushner, Assistant General Counsel of the ILGWU, ¶¶ 5, 12.

The parties accordingly executed a Settlement Agreement, effective July 3, 1973. By its terms plaintiff agreed to employ no less than thirty-three operators at its Arecibo plant, and acknowledged that it continued to be bound by the Association Agreement; in return the Union agreed to withdraw with prejudice its claim for arbitration. Both sides also stated that the grievance and arbitration features of the Association Agreement would govern any violation of the Settlement Agreement.

In January of 1975, plaintiff withdrew from the Association and in March it advised the Union that it was terminating its Puerto Rican activities and transferring all its work to the non-Union plant in the Dominican Republic. On February 7, 1975, the Union filed the claim in arbitration which is the basis of this dispute, alleging that plaintiff was performing work outside its Puerto Rican plant in violation of both the Association and Settlement Agreements. Subsequently the Union amended the claim in arbitration, asserting that it had been fraudulently induced

by plaintiff to enter into the Settlement Agreement and requesting that that agreement be vacated.

## Plaintiff's Contentions

Two grounds are offered by plaintiff in support of a permanent stay of the scheduled arbitration. The first is that the arbitrator is without jurisdiction to hear the claim of fraud in the inducement of the Settlement Agreement for the dual reasons that such a claim exceeds the scope of the arbitration clause of the Settlement Agreement and that, in any case, that issue is one for the court. The second ground relates to the arbitration procedure; because of plaintiff's withdrawal from the Association and its operation of a non-Union shop outside Puerto Rico, its interests are diametrically opposed to the interests of the Association and the Union, which designated the arbitrator. The latter, professedly, thus has a real appearance of bias by being identified with and holding his office subject to the joint interests of the Association and the Union.

## Arbitrability of the Fraud Claim

■ Plaintiff's initial contention is that the ostensibly limited arbitration provisions of the Settlement Agreement pose a bar to the arbitration of the validity of that Agreement. The clause in question states:

> "Any violation of this Agreement will, however, be subject to the grievance and arbitration procedure contained in the aforementioned Agreement between the Union and the Apparel Manufacturers Association of Puerto Rico, Inc." Exhibit B to Kushner affidavit.

Purportedly, this language establishes that the grievance and arbitration procedures can be evoked only to resolve alleged violations of the Settlement Agreement; the restrictive language was purposefully inserted to prevent assaults on the validity of the Settlement Agreement and to provide clear evidence of an intent to submit the issue of va-

lidity to a court rather than to an arbitrator. Plaintiff's Supplemental Memorandum at 13, 15.

Whether the parties to a bargaining agreement have agreed to submit specific issues to arbitration is a question the court must decide, Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962), and in my view the language of the Settlement Agreement does not preclude the submission of the fraud claim to the arbitrator.

First, assuming *arguendo* that arbitrability turns on the language of the Settlement Agreement, it cannot be said with "positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). Bargaining agreements govern a "myriad of cases which the draftsmen cannot wholly anticipate," and arbitration "solv[es] the unforeseeable." *Id.* at 578, 581, 80 S.Ct. at 1351. Whatever doubts are raised concerning the correct construction "should be resolved in favor of coverage." *Id.* at 583, 80 S.Ct. at 1353. The language authorizes arbitration of "any" violation of the Settlement Agreement; it is more than arguable that a claim of fraud in the inducement of the Settlement Agreement is embraced within that language. *See, e. g.,* Cooper v. Computer Credit Systems, Inc., 40 A.D. 2d 692, 336 N.Y.S.2d 380 (2d Dep't 1972); Aerojet-General Corp. v. Non-Ferrous Metal Refining, Ltd., 37 A.D.2d 531, 322 N.Y.S.2d 33 (1st Dep't 1971); *cf.* ILA v. New York Shipping Association, 403 F.2d 807, 810 (2d Cir. 1968). Further, "there is no exclusion where a clause is susceptible of two interpretations, one of which would exclude arbitration, the other of which would not." Jennings v. Westinghouse Electric Corp., 283 F.Supp. 308, 319 (S.D.N.Y.1968).

■ Second, this Circuit has insisted that exclusionary clauses be "clear and

unambiguous," Communications Workers of America v. New York Telephone Co., 327 F.2d 94, 96 (2d Cir. 1964), even where the arbitration language is narrower than the language normally found in the "standard" arbitration clauses. IEU v. General Electric Co., 407 F.2d 253, 262–63 (2d Cir. 1968), cert. denied, 395 U.S. 904 (1969); cf. Cook v. Gristede Brothers, 359 F.Supp. 906, 908 (S. D.N.Y.1973). Had the parties intended to so restrict the scope of the clause, the limitation should have been clearly spelled out.

■■■ Third, and most significantly, plaintiff ignores the fact that the Settlement Agreement is inextricably linked to the underlying Association Agreement. Article XXIII, section 2, of the latter explicitly states that a member remains bound by the Association Agreement and liable for its entire term regardless of withdrawal from the Association:

"ARTICLE XIII: ASSOCIATION
MEMBERSHIP—CONTINUED
OBLIGATION

2. All members of the Association at the time of the execution of this agreement and the persons, firms and corporations becoming members thereof subsequent to the date of the execution of this agreement shall be and continue to remain personally and individually liable hereunder for and during the term hereof, irrespective of whether said member shall cease to be a member of the said Association prior to the date set for the expiration of this agreement and such liability shall be deemed to have survived the termination of such membership and shall continue for and during the full term hereof." Exhibit A to Kushner affidavit.

Plaintiff is thus bound by every provision of the underlying agreement, including its broad arbitration clause, set out and discussed infra. See Monroe Sander Corp. v. Livingston, 377 F.2d 6, 11 (2d Cir.), cert. denied, 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed.2d 89 (1967). This continued liability was reaffirmed in the Settlement Agreement, which states:

"WHEREAS Makress is a member of the Apparel Manufacturers Association of Puerto Rico, Inc., and labor relations between Makress and the Union are controlled and the parties are bound by an Agreement between the Union and said Association, dated May 1, 1972 . . ." Exhibit B to Kushner affidavit.

Hence, the Association Agreement continued to be the basic charter governing the relations between plaintiff and the Union even after the Settlement Agreement was executed.[1] When the parties made "any violation of this Agreement" subject to the arbitration procedures of the bargaining agreement, they incorporated those procedures in toto. Those provisions, to which I now turn, and not the language of the Settlement Agreement, will determine the arbitrability issue. Cf. ILA v. New York Shipping Association, supra, 403 F.2d at 810–11; District 2, Marine Engineers v. Falcon Carriers, Inc., 374 F.Supp. 1342, 1347–48 (S.D.N.Y.1974).

The arbitration clause of the Association Agreement, Article XXII, provides as follows:

"ARTICLE XXII: ADJUSTMENT
OF DISPUTES

1. Any and all complaints, disputes, controversies, claims and grievances between the Association or any of its members, and the Union or any

---

1. Several other factors support this conclusion. Aside from the express undertaking that the grievance and arbitration procedures of the Association Agreement governed violations of the Settlement Agreement, the parties specifically bound themselves to the contracting out and inspection of books and records sections of the Association Agreement. More-over, the Settlement Agreement contained no independent termination date, indicating that it was subordinate to the bargaining agreement. Finally, the Settlement Agreement was intended to resolve a then-pending dispute which had been submitted to arbitration pursuant to the terms of the Association Agreement.

of the workers, arising under, out of, or in connection with, or in any manner relating to this agreement, or the violation thereof, or the acts, conduct or relations between the parties or their members, including, without limitation, any claim against a member of the Association arising out of any alleged dissolution or termination of its business prior to the expiration of the term hereof, shall be submitted by the party hereto claiming to be aggrieved to the other, and the manager of the Association and the manager of the Union or their deputies shall in the first instance jointly investigate such complaint, dispute, controversy, claim or grievance and attempt an adjustment. Should the question in dispute not be fully adjusted, it shall be submitted to arbitration pursuant to the laws of the State of New York before the Impartial Chairman hereinafter designated as Arbitrator, whose award shall be final and binding. In addition to grant such other relief as he may deem proper, the award of the arbitrator may contain provisions directing or restraining acts and conduct of the parties. Any such award may be enforced by appropriate proceedings in law or in equity. The taking of an oath by the Arbitrator is hereby expressly waived. His fee shall be borne equally by the parties.

.    .    .    .    .    .

7. It is agreed that the machinery provided herein for the settlement of all complaints, disputes, controversies, claims and grievances arising under, out of or in connection with, or in any manner relating to this agreement, or the violation thereof, or the acts, conduct or relations between the parties or their members, shall be the exclusive means for the determination thereof, and that neither the Association or any of its members nor the Union shall institute any action or proceeding against the other in any court of law or equity, other than affecting arbitration as herein provided, or respecting enforcement of an arbitrator's award rendered hereunder. This provision shall be a bona fide defense in any action or proceeding instituted contrary to this agreement." Exhibit A to Kushner Affidavit.

These provisions are as broad as imaginable, providing for arbitration of any and all complaints, disputes, controversies, claims and grievances between the parties which arise out of the agreement, in connection with the agreement, relates in any manner to the agreement, or in violation of the agreement. They further provide for arbitration of any and all disputes which arise out of or are related to the acts, conduct or relations between the parties. Finally, it is stated that the arbitration procedures are the exclusive means for the determination of all these controversies.

In Prima Paint Corp. v. Flood & Conklin Manufacturing Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), a commercial arbitration case arising under the United States Arbitration Act, 9 U.S.C. § 1 et seq., the Court held that in the absence of a claim that fraud was directed to the arbitration clause itself, an arbitrator can determine that the contract from which he derives his power to arbitrate was induced by fraud and therefore invalid. There is no question that the arbitration provisions here are as broad, if not broader, than arbitration clauses which have been held to empower the arbitrator to pass upon charges of fraud in the inducement of the contract. *See Prima Paint, supra;* Erving v. Virginia Squires Basketball Club, 468 F.2d 1064 (2d Cir. 1972); Weinrott v. Carp, 32 N.Y.2d 190, 344 N.Y.S.2d 848, 298 N.E.2d 42 (1973).[2]

2. In *Prima Paint,* the arbitration clause read: "Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration . . . ." 388 U.S. at 398, 87 S.Ct. at 1803; in *Erving,* the clause read: "In the event of any dispute arising between the PLAYER and the CLUB relating

Plaintiff, however, disputes the application of *Prima Paint* and its progeny to labor arbitration cases arising under collective bargaining agreements. But, at least in this Circuit, the time has long since passed for an argument that the United States Arbitration Act is inapplicable to labor arbitration cases, at least so long as the unions are not "actually in the transportation industries." Signal-Stat Corp. v. Local 475, United Electrical Workers, 235 F.2d 298, 302 (2d Cir. 1956), cert. denied, 354 U.S. 911, 77 S.Ct. 1293, 1 L.Ed.2d 1428 (1957); International Association of Machinists and Aerospace Workers v. General Electric Co., 406 F.2d 1046, 1049–50 (2d Cir. 1969); Bell Aerospace Co. Division of Textron, Inc. v. Local 516, UAW, 500 F.2d 921, 923 (2d Cir. 1974); Holodnak v. Avco Corp., 381 F. Supp. 191, 198 n. 7 (D.Conn.1974); *cf.* Necchi v. Necchi Sewing Machine Sales Corp., 348 F.2d 693, 696 (2d Cir. 1965), cert. denied, 383 U.S. 909, 86 S.Ct. 892, 15 L.Ed.2d 664 (1966).

It follows that *Prima Paint* is relevant to labor arbitration cases, and it has been so held. Anna's Queen, Inc. v. Dining Room Employees, 85 LRRM 2375 (S.D.N.Y.1974); Paramount Bag Manufacturing Co. v. Local 98, Rubberized Novelty Workers, 353 F.Supp. 1131 (E.D.N.Y.1973). In *Paramount,* the court addressed itself to the same contention plaintiff makes here,

"The foregoing authority cannot be distinguished, as Paramount attempts, as germane only to cases to which the Federal Arbitration Act (Act), 9 U.S.C. § 1 et seq., applies. There is nothing in that Act, and particularly in § 1 thereof, which requires different treatment for labor agreements than for commercial or other agreements providing for arbitration of disputes. There can be no question that the union here, if it chose, could have invoked the summary procedures of the Act to test out its right to arbitration instead of by complaint under § 301 of the Labor Management Relations Act. International Ass'n of Mach. & Aerospace Workers v. General Electric Co., 406 F.2d 1046, 1049 (2 Cir. 1969). Furthermore, as the foregoing case points out, 'the Arbitration Act ordinarily does apply to suits upon collective bargaining agreements' unless the employees are actually engaged in the transportation industries. *Id.,* citing Signal-State Corp. v. Local 475, United Electrical Workers, 235 F.2d 298 (2 Cir. 1956), cert. denied 354 U.S. 911, 77 S.Ct. 1293, 1 L.Ed.2d 1428 (1957)."

353 F.Supp. at 1138–39.

and held that a claim of fraud in the inducement of a bargaining agreement is for the arbitrator when the arbitration clause is sufficiently broad to encompass such a claim.[3]

to any matter or thing whatever, whether or not arising under this Contract, or concerning the performance or interpretation thereof, such dispute shall be determined by arbitration . . . ." 468 F.2d at 1066 n. 1;
and in *Weinrott,* the arbitration clause read: "All disputes, controversies or claims arising hereunder, the interpretation of any of the provisions or the performance called for thereunder shall be settled by arbitration . . . ." 32 N.Y.2d at 196, 344 N.Y.S.2d at 853, 298 N.E.2d at 45.

3. The instant provisions are in fact broader than the arbitration clauses in *Anna's Queen,*
"Any dispute arising under the interpretation or application of any of the provisions

of this agreement, where the same is not resolved between the parties, shall be referred to arbitration in accordance with and pursuant to Section 4(b) hereof." 85 LRRM at 2376 n. 3,
and in *Paramount Bag,*
"Any and all disputes, complaints, controversies, claims and grievances whatsoever between the Association or any of its members and the Union or any of the workers covered by this agreement, arising under, out of or in connection with, or in any manner related to this agreement, including, but without limitation, any claim arising out of any alleged dissolution or termination of the business of any member of the Association prior to the expiration of the term of this agreement, shall be taken up for settlement and adjustment by representatives of

Moreover, even assuming for the moment that *Prima Paint* is not necessarily pertinent to labor arbitration cases, nonetheless the principle that case stands for is applicable here. In *Warrior & Gulf,* the Court expressed the strong federal policy favoring labor arbitration:

"The present federal policy is to promote industrial stabilization through the collective bargaining agreement. . . . A major factor in achieving industrial peace is the inclusion of a provision for arbitration of grievances in the collective bargaining agreement." 363 U.S. at 578, 80 S.Ct. at 1350 (footnotes omitted).

In that case the Court also dealt with the question of the differences between labor and commercial arbitration, and explained why the former must be favored:

"In the commercial case, arbitration is a substitute for litigation. Here arbitration is the substitute for industrial strife." *Ibid.*

National legislation clearly favors arbitration of labor disputes, *see* Sections 1, 201(b) and 203(d) of the Labor Management Relations Act, 29 U.S.C. §§ 141, 171(b), 173(d), and the Supreme Court has recognized the importance of this policy by expanding the role of the arbitrator in labor controversies, *see, e. g.,* John Wiley & Sons v. Livingston, 376 U.S. 543, 549–50, 84 S.Ct. 909, 11 L.Ed. 2d 898 (1964); Boys Markets, Inc. v. Retail Clerks Union, 398 U.S. 235, 252–53, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); Local 150, IUE v. Flair Builders, Inc., 406 U.S. 487, 491–92, 92 S.Ct. 1710, 32 L.Ed.2d 248 (1972); Gateway Coal Co. v. UMW of America, 414 U.S. 368, 376,

379–80, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974). If fraud in the inducement of the contract is for the arbitrator in commercial cases, then *a fortiori,* it is an appropriate question for the arbitrator in labor disputes.

### Disqualification of the Impartial Chairman

Plaintiff further contends that even if the claim of fraud in the inducement of the Settlement Agreement is subject to arbitration, the Impartial Chairman should be disqualified from hearing the issue due to potential bias and conflict of interest engendered by plaintiff's withdrawal from the Association and its operation of the non-Union shop in the Dominican Republic. The only apposite authority submitted in support of this assertion is Application of Steuben, 97 N.Y.S.2d 613 (Sup.Ct.1950).

In *Steuben,* an employer resigned from an employer association prior to an arbitration between it and the union. The withdrawal was accompanied by great hostility between the employer and both the union and the employer association. Hearings were held before an ad hoc arbitrator, but prior to the final decision the arbitrator was appointed permanent Impartial Chairman under a new contract between the union and the association. The court held that under these circumstances the permanent appointment tended to bias the arbitrator's judgment, and denied the union's motion to confirm the award.

Despite some factual similarity to *Steuben,* the controversy here involves no claim of hostility between plaintiff and the Association, and the tenure of the Impartial Chairman commenced almost ten years prior to the initiation of the

---

the Union and the Association. Should any such matter not be fully adjusted as aforesaid, it shall be submitted to the Labor Board hereinafter referred to. Should the Labor Board fail to agree or fully adjust the matter, or at the request of either party without submission of the matter to the Labor Board, the matter shall be submitted to arbitration before the Impartial Chairman hereinafter named, or designated as

hereinafter provided as Arbitrator, whose award shall be final and binding. In addition to granting such other relief as he may deem proper, the award of the Impartial Chairman may contain provisions directing or restraining acts and conduct of the parties. Any such award may be enforced by appropriate proceedings in law or in equity." 353 F.Supp. at 1134 n. 1.

instant arbitration. But I prefer not to rest decision on such facile distinctions. If *Steuben,* a case never appealed nor ever cited by any other New York court, suggests, as plaintiff contends, disqualification under the circumstances of this case, then I choose not to follow it.

 Plaintiff, when it became a member of the Association, agreed to all of the terms of the Association Agreement. One such term is that a member remains bound to arbitrate all disputes during the life of the agreement before the Impartial Chairman, irrespective of withdrawal; that the arbitrator was selected by the Association and the Union was a fact well known to plaintiff, and therefore this is not a case of undisclosed dealings between one party and the arbitrator. *See, e. g.,* Commonwealth Coatings Corp. v. Continental Casualty Co., 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968). Since arbitration before the Chairman was contemplated by all parties to the Association Agreement, it would appear that any objections to the Chairman on the ground of conflict of interest were waived upon membership in the Association. Garfield & Co. v. Wiest, 432 F.2d 849, 853–54 (2d Cir. 1970), cert. denied, 401 U.S. 940, 91 S.Ct. 939, 28 L.Ed.2d 220 (1971).

No violation of any canon of fairness is fostered by merely holding a party to its contractual obligations. Kulukundis Shipping Co., S/A v. Amtorg Trading Corp., 126 F.2d 978, 985 (2d Cir. 1942). Other than in *Steuben,* courts have consistently held parties to mutually agreed upon practices or arbitration procedures which they selected. *See, e. g.,* Reed & Martin, Inc. v. Westinghouse Electric Corp., 439 F.2d 1268, 1273–74 (2d Cir. 1971); Catz American Co. v. Pearl Grange Fruit Exchange, Inc., 292 F. Supp. 549, 552–53 (S.D.N.Y.1968); City of Naples v. Prepakt Concrete Co., 490 F.2d 182, 184 (5th Cir.), modified on other grounds, 494 F.2d 511 (5th Cir. 1974); Amerada Hess Corp. v. Local 22026 Federal Labor Union, 385 F.Supp.

279, 283 (D.N.J.1974); Cross Properties, Inc. v. Gimbel Brothers, Inc., 15 A.D.2d 913, 225 N.Y.S.2d 1014, 1016 (1st Dep't), aff'd, 12 N.Y.2d 806, 236 N.Y.S.2d 61, 187 N.E.2d 129 (1962).

 Finally, I am also persuaded that plaintiff's assertion is disingenuous. Though plaintiff has been producing in the Dominican Republic since 1972, it never challenged the Impartial Chairman on grounds of bias and conflict of interest. Nor had it raised the issue after the withdrawal from the Association in its several appearances before the Chairman, including one appearance just a week before this action was brought before me. In fact, the issue was never raised until the day before the date set for arbitration.

It is ordered that the temporary stay of arbitration dated April 16, 1975, be vacated, and that plaintiff proceed with arbitration before the Impartial Chairman.

So ordered.